Council, I should tell both sides that both Loretta Lynch and Mike Peavy are long-time friends of mine, so they come out even. Does anyone have any objection to my hearing this case? Certainly not, Your Honor. Okay. I'm not going to mind the last week's questions. It's important for her to hear from the Applebee's first. Well, I assume they don't have anything more to add to their statement. You haven't talked to Mr. Peavy since counsel said that he had the authority to direct you to answer the question. It's the view of the Office of the President of the Commission that the representation for requests is from the Commission. All right. The Applebee, however, isn't in a position to answer. Pardon me? No, no. I know they answered it once before, I think. Yes. And, Your Honor, just to be clear, we're talking not just about a retaliation for First Amendment exercises, but any kind of claims. And that applies. We just asked that question as to all claims. I'm sorry, Your Honor. We asked the question as to all claims. Yes, Your Honor. And aside from whether there could be any such claims, is there anything else that, in your view, makes this case not moot? Yes, Your Honor, absolutely. My name is John J. Davis, Jr. I, of Davis, Cowell & Bowe. I represent the appellants Loretta Lynch and Carl Wood, and I'd like to reserve five minutes of my time. Your Honor, imagine the torment of Loretta Lynch and Carl Wood throughout the year 2004. Well, torment may be a little strong. There are lots of public issues that are difficult and unfortunate. They go on all the time these days. This, but in any event, we'll feel their pain if you'd like. This was a very extraordinary sort of pain. Every time they voted during that year on a PG&E matter or supervised a PG&E case, they had to choose between violating their oath of office or being sued by PG&E and their fellow commissioners. What a sword of Damocles. Every time they voted, all of their assets were at risk. Lynch and Wood's torment was injury, injury that's already occurred, and that torment is injury for which they have a right to recover damages. But if you dismiss this case and the bankruptcy settlement becomes final, that recovery will be made enormously more difficult, if not impossible. As soon as Ms. Lynch and Mr. Wood sue, the defendants will storm into Federal court. They'll demand an injunction against the lawsuit. They'll also ask for a contempt order. Mr. Davis, this is a painful hypothetical, but it's a hypothetical, is it not? I mean, no action has been filed at this point against them. Not yet, Your Honor. But that sword of Damocles from the PUC's lawyers, Mr. Rieman's firm, still hangs over their head. There are all sorts of horrible things that could happen, but doesn't our precedent in Federal court say we're not allowed to speculate as to what might happen in the future? We have to look at where the situation lies today in resolving a question as to whether there is an extent, claim, or controversy now pending before us. It's not, I think, a question, Your Honor, of whether the claim is now pending, but whether Ms. Lynch and Mr. Wood have claims to assert, which certainly they do. You're talking about claims. You're talking about Lynch asserting a claim against PG&E? That's correct, Your Honor. What would be the basis of that claim? Well, let's start with this. What's the 1983? Well, certainly, as against their fellow commissioners and even their lawyers, there would be a Section 1983 claim. On what theory? For the impairment of their First Amendment rights and the impairment of their co- Her co-commissioners violated her First Amendment rights by entering, by approving this, this settlement agreement. By entering into a settlement agreement that constrained the exercise of those rights. How does it constrain the exercise? I don't quite follow that. It constrains them by committing them, as it did in paragraph 21 of the settlement, never to contest the validity of that settlement, and as it did in other provisions like paragraph, I think, 23, that they would support that settlement in all fora, legislative, judicial, and administrative. And by subjecting them to a claim for damages, given the waivers of immunity that it purported to make, if they were to do anything that was not entirely consistent with those commitments. Did it prevent them from resigning from their jobs and opposing the settlement as individuals? I'm sorry, Your Honor. Did it prevent them from resigning their positions and opposing the settlement as individuals, as public citizens? It didn't prevent them from resigning, but that would not have been carrying out their duties, and they felt duty-bound to continue in office. So does a public official have a First Amendment right to oppose the position of an administration, for example? I mean, suppose the governor says, anybody who wants to stay in this administration has to support my bond plan, else go somewhere else. Is that a violation of their First Amendment rights? I don't think that per se violates their First Amendment rights, but here we had some much more direct, much more stringent constraints, constraints that were enforceable in any court of PG&E's choosing or the other commission. I understand that, you know, and it's enforced, but is there anything wrong with somebody saying to a commission under an agreement that the commission's official position and its commissioners must be X? You must maintain that official position. That the commission agrees to that in an agreement. Is that a First Amendment violation? As long as those commissioners, if they disagree with that, are free to resign and go publicly attack the commission. They're certainly free to resign, and they're free to do as, frankly, Ms. Lynch did, which was to take the position that she thought was the right one, even though it didn't agree with Governor Davis's view. Well, yes, she should. But that's a very different question. The question is whether you can do that while you're holding office. And you can, as a commissioner, disagree with the governor. There's no question. But whether the commission can enter into an agreement that says this is to be the policy of the commission, as long as the commission has approved that agreement by a majority vote. I think it's one thing to enter into an agreement that says this is going to be the policy of the commission, if, in fact, it has the authority to enter into that agreement, which this commission did not. But there are people that approved this agreement. That's correct, Your Honor. So what more? Well, this was an agreement that purported to waive Eleventh Amendment immunities without having the authority to do that. In Atascadero State Hospital, the Supreme Court made it explicitly clear that for an individual official immunities, there has to have an explicit authorization from the legislature that actually says in affirmative terms that they can submit to a claim in Federal court. And that authorization was not given here. But they went further and waived the governmental, the individual official immunities. But that claim has never been tested, Mr. Lynch. There has been no lawsuit filed by which an individual commissioner, let's say Ms. Lynch, then had to raise the Eleventh Amendment immunity defense. We don't know whether a court would uphold it or not, do we? Well, I think this Court's cases make it clear that as long as the claim exists, it doesn't have to be pending in a lawsuit. But we don't know the answer to the validity of the waiver, is my question, do we? Well, that's certainly a question that we hope this Court will answer in the course of time. Or an advisory opinion from us? I don't think it's an advisory. Would or would not be a valid waiver? I'm sorry. You're asking us for an advisory opinion, aren't you? So whether or not it would or would not be a valid waiver in the absence of any actual lawsuit being filed seeking monetary damages. No. As we challenge this bankruptcy settlement, one of the central issues is whether that was a valid waiver and whether the PUC as an agency was properly before the Bankruptcy Court. And that was just where you're losing me in the train of your argument is I can understand the hypothetical question, but because nobody has sought damages and the defense of sovereign immunity has yet to be raised to prevent such a claim from going forward, we don't know whether the waiver is valid or not. Well, we're not talking about the prospect of a defense based on sovereign immunity to the claims that Ms. Lynch and Mr. Wood will assert elsewhere. Eleventh Amendment immunity. Presumably if she were sued today, if she were still a commissioner, for entering into the settlement agreement, if she voted in favor of it, one of the defenses that the State would raise as soon as the lawsuit was filed would be an Eleventh Amendment claim, would it not? And then the question would be whether or not the provision in the Bankruptcy Court's reorganization plan was enforceable or not. Well, if you're talking about Ms. Lynch being sued, if I understand the question correctly, I'm not sure I understand the hypothetical well enough to understand who would be suing her. If you're talking about a member of the public suing her for ---- I didn't mean to get us off on a tangent. Let me ask you a more fundamental question, and that is, if I understand your theory of First Amendment violations correctly, you are saying that she is potentially liable to lawsuit by PG&E or some other party seeking to enforce the provisions that she wasn't supposed to object to the agreement. But didn't she actually do that? Not only did she object to the agreement, she voted against it as a commissioner. She hired you to appear before Judge Montali to interpose objections to the entry of the agreement. How were her First Amendment rights violated? Doesn't your theory depend on the fact that she actually carried out her First Amendment rights, and that's what renders her potentially susceptible to liability from this claim yet to be filed in a lawsuit not yet docketed? I think the constraints on First Amendment rights that are most significant here to the question of mootness are the ones that ask whether, and we think the answer is that she does have an affirmative claim to assert under Section 1983 against her former fellow commissioners. We think she plainly has that right. And those First Amendment rights were violated by the strictures of this settlement that constrained her in a number of different ways. She's not named in this settlement agreement as an individual. Oh, yes. In the settlement agreement. Where do we see Ms. Lynch's name as an individual in this agreement? Well, if you look at paragraph 1M of the settlement. 1M, right? They're named in their official capacities and their respective successors. There is a difference in 1983 litigation between the constitutional litigation between somebody in their official capacity, which is nothing more than suing the individual in their capacity as an official of the State, and in essence, it's just like suing the State, as opposed to suing somebody in their individual capacity where they are personally liable for their wrongdoing. I think that's correct to an extent, Your Honor. But every public official who acts in a way that gives rise to Section 1983 liability, even if it's personal liability that's recognized under Hafer v. Mello, is nevertheless taking the actions that they take in an official capacity. Otherwise, they wouldn't be acting under the color of State law. Acting under the color of law. I'm sorry? They have to be acting under the color of State law. Yes, that's correct. In their individual capacity. That's correct. But this agreement only treats them in their official capacities. It does, but it exposes them to personal liabilities for damages and for contempt if they don't comply with the strictures of the settlement agreement. My understanding is the commission had to comply with this agreement. The commission, as an official body, had to comply with this agreement. That's correct, Your Honor. But the fact of the matter ---- As I understand it, Lynch could object and say this is terrible for the rate payers and we're binding the role of the commission in the future and rate payers are going to pay higher rates and this is a terrible agreement and I don't think it's in the best interest of the rate payers of California. The problem with that, Your Honor ---- Against it. The problem with that, Your Honor, is that that was an invalid waiver of Eleventh Amendment immunity. In fact ---- I'm not talking about waiver. I'm just talking about under this agreement, as I understand it, she was free to vote against this. She was free to vote against it in terms of adopting it. But the fact is that once adopted, that agreement purported to constrain her every action as a commissioner. Where does it say that? Where does it say that, Ms. Lynch, you have to vote X manner? Doesn't it say that the commission, it's the commission, three members of the commission control, right? Well, but to implement that settlement agreement, you had to have a number of actions done. Ms. Lynch had various cases, rate-making cases, investigations that she supervised involving PG&E. And if she didn't vote to dismiss or act to dismiss or act not to prosecute those ---- How many votes does it take to dismiss a case like that? Could she just dismiss a case on her own? I don't know, Your Honor. I don't. But the fact is that because the Eleventh Amendment immunity waiver was invalid, it was indeed the five commissioners who were before the Bankruptcy Court, and that's why you have that definition of commissioner. Aren't you, Mr. Davis, aren't you completely overlooking the Supreme Court precedent on collegial bodies and that it is the collegial body which is bound regardless of the individual views of its members once the vote is taken? Not at all, Your Honor. The collegial body may or may not be bound. But what we have here is a particularized individual injury that was done to Ms. Lynch and Mr. Wood. And that's what distinguishes that case from cases from the ---- I call them the sore loser cases like Bender and Karsten. They were particularly harmed, individually harmed, whereas Mr. Youngman in the Bender case and Ms. Karsten in her case were not. They were simply trying to usurp the prerogatives of their boards. And that's not what's happening here. Here we have particularized individual injuries. Mr. Davis, you have just under five minutes. You may want to save some time for rebuttal. Let me just ask you one question. I understand the bad blood that exists over this case and in the relations of the ---- that there were on the commission. But at this stage in the litigation, do you think there's any chance that mediation might resolve the overall dispute? I would only be speculating, Your Honor. I think that the lines are pretty harshly drawn. I make it a policy never to say no to mediation because I've oftentimes been surprised. So it would be hard for me to guess at that. Yeah. You know, what to do about a dispute often depends on how you evaluate the litigation, as you know, and what future, past, present. You know, it might be that the parties at this stage, having vented as much as they have and made the efforts that they have all in good faith, that they might look at the litigation at this point and think that this might be a time to draw an end to the dispute and move on with the rest of their lives. But maybe not. But you never say no to mediation. So we'll see. Thank you very much, Your Honor. I'll reserve the balance of my time for reply. Good morning. May it please the Court. Ethan Shulman for Appellee Specific Gas and Electric Company and PG&E Corporation. Let me start with the mootness issue because it's obviously the threshold jurisdictional issue before us, and I think it's quite clear from the colloquy with counsel that there is no remaining dispute here to be resolved, whether by mediation or otherwise. There's no live case for controversy. That's true. There's nothing to be resolved by mediation if one side is going to win the case, and you assume that. Does that mean that you're not willing to participate in mediation? Not at all. And without disclosing anything I shouldn't, Judge Reinhart, I will tell you that we repeatedly indicated willingness to go down that route and have been rebuffed on every occasion. And secondly, the answer to the letter we sent you? And as you said, Judge Reinhart, we had answered those questions again, and we're happy to reaffirm those answers. That is, we read the agreement just the way the Court, I believe, reads it. That is to say, the party to the agreement is the commission as an entity. The individual commissioners, as Judge Pai has observed, are parties only insofar as they act on behalf of the commission in their official capacities, and PG&E has no intention of taking any action against individual commissioners who no longer have official capacities for any alleged breach of the settlement agreement. Now, counsel started out talking about, in very dramatic terms, about the year 2004 and the torment that these appellants purportedly went through, and there are really two answers to that. Number one is we're not in 2004 now. PG&E emerged from bankruptcy in 2004, in May of that year, April or May. We are now almost two years down the road. These commissioners' terms expired at the end of 2004. They no longer have any official duties or any capacity to act on behalf of the commission. And so the threshold question before the Court is, is there any remaining live case or controversy in an appeal which poses the sole issue, whether at the time they were commissioners, they had standing to appeal from a decision that the full commission had approved where they had dissented from the commission vote. That issue has now become moot, and became moot at the end of 2004 when their terms expired. The other answer to it, of course, just as a factual matter, as Judge Tallman observed, is whatever torment they may have suffered in year 2004, it wasn't enough to cause them to change their votes. By Ms. Lynch's declaration, which is in the record, she voted on at least one occasion and perhaps two against full commission decisions that she believed were compelled, evidently were compelled by the settlement agreement, and where she believed, evidently, that her vote was somehow inconsistent with the settlement agreement. She nonetheless did it. So what that claim is, that unasserted hypothetical claim, is unclear to me, but whatever it is, it's certainly in the past. On this mootness issue, these are really very basic elementary principles, and I don't need to remind the Court at too great length of them. But in the Arizonans v. Official English case, and in this Court's en banc decision recently in Gator.com, the Court has recognized that, of course, there must be a live case or controversy at all stages of a case, not just when it's originally filed. This Court routinely dismisses appeals as moot when they become moot after a lower court decision and while an appeal is pending, and indeed in Gator.com, I believe it was even after oral argument before the en banc court that that case became moot, and the Court nonetheless dismissed as moot before it issued its opinion on the merits. Perhaps the easiest way to deal with some of these fantastical speculations is to deal with them a little more concretely. The reply brief talks extensively about the ex parte young doctrine and about how somehow these appellants are open to personal liability. I think counsel said all of their assets are at risk because of the waiver of immunity that's contained in the settlement agreement. Ex parte young, of course, supports our position and shows that that argument really makes no sense. Ex parte young provides an exception to 11th Amendment immunity, which allows individual state officers to be named in their official capacities for prospective relief only. So in two respects, this imaginary fear of a claim for damages makes no sense. Ex parte young only allows action against officials in their official capacities, which appellants no longer have. Let's assume for the moment there is a claim or could be a claim for damages. How does the fact that this case might be moot affect the merits of that claim? Let's assume there were a lawsuit tomorrow that says the plaintiffs, the two former members of the commission, were injured during the course of their term by the fact that the commission entered into an unlawful agreement that caused them injury. Does calling this case moot affect their right to bring that claim? Would they be barred from challenging the validity of the agreement in that suit because this suit was dismissed? Judge Reinhardt, I think the answer to the question is this Court's dismissal of an appeal as moot would not affect their ability to assert whatever claims they may think they have that arise out of past events. And indeed, there's no necessary connection between the issues that are raised here. Really, there's only one issue. It's a standing issue. And the standing issue, ironically, itself became moot while the appeal was pending. Well, that's not the underlying case. It's not a case of a standing. I mean, there may be a standing defense to it, but the underlying claim is about the invalidity of the agreement. There are certainly underlying claims. Of course, Judge Walker ---- If it were held moot and the district court opinion were vacated, what effect would that have on any future claim? To the extent that there are claims here that are unrelated to the validity of the settlement agreement and the plan that was confirmed by the bankruptcy court, whatever those claims may be, those claims could be asserted. To the extent there are attempts now, belatedly, two years down the road, to challenge the validity of the settlement agreement, the short answer is these commissioners did not have standing to appeal. Other parties did, by the way, Judge Reinhart, appeal from the confirmation order who did have standing. There was an appeal in this court, and there were appeals in the state court system. And those appeals were all resolved. But for dissenting commissioners who are indeed sore losers, they simply disagreed with the majority of the commission. I don't know. It's not necessary to, you know, identify the qualities of the commissioners on either side. You could say that sore losers, another characterization could be they're commissioners of great principle. I don't mean at all, Judge Reinhart, to denigrate them. I was simply using counsel's term to identify the body of case law that culminates in Bender that indicates that members of collegial bodies do not have standing separate and apart from the standing that the body itself has. So, but the short is, let me come back to your question, because I haven't adequately answered it. This Court does not sit to decide moot cases in order to help litigants before assert claims that they have not yet asserted. That wasn't really the question, whether we sit for that purpose. The question was, and the question wasn't what we should do about it. The question just was whether in any way the dismissal of this case as moot would have any effect on whatever right they have. And I think the answer is to the extent they sought to collaterally to challenge the validity of this settlement agreement, the modified settlement agreement and the plan of reorganization, which they never appeared to object to in the bankruptcy court, they never filed written objections to, and they did not have capacity to file an appeal from, they might well be looking at, in some hypothetical situation, collateral estoppel effects that would preclude them from challenging its validity to the extent they have. As a result of the dismissal of this suit? As a result of the fact that they never effected a proper appeal in the first place and that all other appeals have been resolved. Yeah. But that exists wholly aside from this suit. That's right. I mean, that's basically a time bar. It's a procedural bar. That's right, Judge Tolman. It's a procedural bar, and it results from the fact that the bankruptcy court confirmed this plan in early 2004. All appeals have been resolved, and that's the end of it. The utilities emerged from bankruptcy. The bondholders and creditors have been paid, and we've moved on. But presumably, if I heard Mr. Davis's argument correctly, if they were to file a separate lawsuit seeking First Amendment damages for the suffering in 2004, a court could still look at the waiver provisions in the settlement agreement to decide whether or not those waiver provisions ought to be given effect, if they were somehow relevant to claims or defenses in that litigation, whether it would arise by way of a direct claim or a cross-claim or something. You know, part of my problem, Judge Tolman, is I'm having trouble understanding the hypothetical fully, because the idea of a public official suing his or her colleagues on a public body for having taken an official action that they believed was in the public interest as members of a rate-making regulatory body is so sort of out there, if you will, that I'm having trouble imagining it. I suppose it's possible in that hypothetical case, as between those litigants, for a court to say, well, they shouldn't have done that, or they went further than they were allowed to go in waiving sovereign immunity, without affecting the fact that the agreement itself is now final and unimpeachable by any other party in any other context. I will note, by the way ---- Are you sharing time with your co-counsel? I am, and I'm cognizant both of the time and of the lighting system. So I'll ---- let me make one more point, if I may, and then I'll cede the rest of my time to him. Judge Tolman, you pointed out, and this is really collateral to all of this, because none of these claims are before the Court, but you pointed out that the sovereign immunity claim that they make here, i.e., that the Commission somehow didn't have the authority to waive sovereign immunity, has never been tested. It's never been adjudicated. And that's correct. So the whole premise here is based on something that is an assertion and an assertion only. And I'll just say, sort of as a footnote, that it's an assertion that's just flat wrong. We've cited, for example, this Court's decision in Katz v. Regents of the University of California, where several years ago this Court said the State of California does have the authority on a case-by-case basis to waive sovereign immunity. So the idea here that somehow this was an unprecedented action and it was invalid as a matter of law really makes no sense. Let me just add, by way of summing up, that if the Court for some reason concludes that there's some live case or controversy here, and I don't think the Court has heard anything other than conjecture about future actions that have not yet happened, and most of which, indeed, have never been threatened, which we've now disclaimed. And if we're to get to the standing issues, there are obviously three different bases that are addressed in the briefing here that show that Judge Walker was correct in concluding that these appellants lacked standing. One was the Article III standing point that we've already discussed, the members of the collegial body not having standing separate and apart from that of the body itself. That's the Bender case. That's this Court's decision in City of Lake Tahoe. And that whole line of authority that follows the Board of Education v. Allen case that appellants rely on so heavily. Even more stringent than that Article III standing standard, of course, is the bankruptcy or prudential standing issue. The appellants here never appeared or objected in the bankruptcy court to the provisions that they then belatedly sought to challenge. And that is a requirement that's very elementary and that courts routinely enforce. By the way, I should add, they plainly had notice of this agreement. The Court will find in the record Ms. Lynch's and Mr. Wood's own declarations in opposition to the stay, indicating that they were aware of the settlement agreement from the very day that it was first announced in June 2003. So that really is a red herring. And then finally, and ironically, I'm getting to this at the very end, although perhaps it's the first issue after mootness, they're not aggrieved parties under the bankruptcy test in this circuit, which requires that they have financial interests that be adversely affected. So for all of those reasons, if the Court for some reason were to conclude this case is not moot, it ought to affirm Judge Walker as to the lack of standing. And with that, I will quickly cede to Mr. Rieman, unless the Court has any questions. Thank you. I'm Walter Rieman for Apelli, the California Public Utilities Commission. First, you'll know from my letter of February 10th that I am unable to respond to the Court's inquiries in its order at this time, but as I indicated before oral argument commenced, we will write to the Court promptly after the Commission's meeting on March 2nd. They said there was a meeting in February. The California, the opposing counsel did. That's the case. California law constrains the way in which the Commission must, may consider subject matter at its meetings. There's a noticing requirement. Agendas are circulated. I'm not an expert on these matters, but it's the view of the office of the President of the Commission and the legal division that the March 2nd meeting is the meeting at which this can appropriately be considered. I don't think you're able to take action on litigation without waiting for a regularly scheduled meeting. Suppose somebody seeks an injunction against the Commission. An injunction would be my understanding is that an injunction could provide a basis for an emergency direction or it might be for an emergency direction from the President of the Commission. I mean, do you need, first place litigation involving state agencies is normally excluded from the Brown Act. You're allowed to do it not under the normal procedures, but litigation can be considered in private by the Commission. I would not think, therefore, that there's any need for the kind of lengthy public notice to how to resolve a lawsuit that there is for the ordinary action of how to regulate a utility and that I would think it would be proper to consider at the next meeting. I can only say that certainly the Commission has routinely made litigation decisions it did on notice with, you know, pursuant to announced agendas and that the office of legal counsel in turn. It's not of great importance. It just sounds to me that they might well be able to do it at the next meeting, is it? Well, the in-house counsel for the Commission is here and I'm certain will consider what Your Honor has said. Could you clarify one thing for me? Certainly. Has there been any veiled threats or any explicit threats that the Commission intends to pursue any kind of, and I know this is related, but up to the present, you know, before the letter from the panel came out, a request. What does the record show of what threats or contemplated action the Commission might take against Ms. Wood for having pursued this litigation this far? The former Commissioners rely on two points and those are the only points of which I'm aware. The first is that a letter was sent to, by counsel to the Commission, to counsel for the former Commissioners stating that if they asserted positions that the Commission continued to be frivolous, the Commission would consider making an application for attorney's fees as a result of those positions. No such application was ever filed. That letter was sent over a year ago. So like, for example, so that their objections before the bankruptcy court were frivolous? That the actually, that the contention was that their position on standing was advanced before the district court was frivolous. But the important point here, aside from. You said there were two. Yes. The second is unrelated to the attorney's fees. What's the second? The second relates to a memorandum sent by the executive director of the Commission during the course of the bankruptcy proceedings directing the then Commissioners, now former Commissioners, not to use state resources to litigate against the Commission. The former Commissioners had submitted pleadings to the court signed by a Commission employee. There were certificates of service signed by Commission employees serving court papers on the Commission. All of that was incredibly disruptive. And the executive director sent a memorandum saying that, in his view, it was not appropriate to spend Commission money and resources to litigate against the Commission. There was no threat of criminal prosecution. There was no threat of referral to bar authorities. There was nothing like that. So as to these two controversies, I would say, first, apart from their attenuated, hypothetical future character, which can't satisfy the pecuniary interest standard applicable here, there is abundant case law from this Court and the Supreme Court saying that applications for attorney's fees do not render an otherwise moot claim alive. And the second dispute, the use of Commission resources, you know, apart from its distance in the past, is the issues presented are unrelated to the issue underlying this appeal.  to the issue underlying the appeal. That is to say, the validity of the confirmation order. Appellants have never explained why the legality or illegality of the confirmation order would have any effect at all on whether they were entitled to use State resources to litigate against the State. So those are the only two claims, Judge Pius. Thank you. The other alleged controversies between the former Commissioners and the Commission on which they rely for standing are potential claims that they say they might want to bring. The first is a claim against my firm. That – such a claim would be totally without foundation on the merits. The Commission's client has all – I'm sorry, my firm's client in this matter has always been the Commission. As a concomitant of that representation, we briefly acted on behalf of all five Commissioners in their official capacities in an Ex Parte Young adversary proceeding brought against them by PG&E, seeking solely injunctive relief to restrain the actions of the Commission itself. The law is very clear that such a representation does not prevent the firm from continuing to represent the Commission even when it is adverse to Commissioners or former Commissioners in their personal capacity. For present purposes, however, perhaps the key point is that the former Commissioners threatened – threat to sue the Commission's lawyers can't say this appeal for mootness. They are, you know, simply not entitled to an adjudication on the legality of the  I mean, as a general matter, certainly a litigant's claim that it is unhappy with conduct by someone it claims to have been its lawyer in a proceeding does not keep that proceeding alive as against the other parties to it. Lastly, we get to a subject that was discussed extensively with Mr. Shulman, the former I have relatively little to add to what has already been said on that subject. The cooperation clause in the settlement agreement was completely ordinary. It applied to the Commissioners only in their official capacities. It consequently did not subject them to claims for damages. The agreement simply subjected the Commission, if the Commissioners caused the Commission to breach the agreement, to relief. That is all it was intended to do, and it's all it did. Thank you, Your Honors. Your Honors, I think that Mr. Riemann has highlighted some of the very claims that the Commissioners do have. Perhaps he thinks that only a brief, for a year or so, representation of the individual Commissioners doesn't qualify as representation that should disqualify him from, or his firm, from opposing them after that. But that's not the law. Can you answer his last point, Mr. Davis? What does all that have to do with their standing to challenge the confirmation of the plan? Well, it has a great deal to do, Your Honor. Mr. Riemann's point is that he thinks he was, or he thinks his firm, was representing the Commission as an entity. In fact, the Commission was never, if Your Honors reach the Eleventh Amendment question and the Ex parte Young question, you can clarify that the Commission as an entity was not before the bankruptcy court and was not his client. The five Commissioners were his client because only under Ex parte Young, the operation of Ex parte Young, could they. Would your argument be that the Commission was without lawful authority to agree to the settlement? Is that where you're going? That's exactly right, Your Honor. It had no authority to waive its Eleventh Amendment immunity. It had no authority to waive its members' personal, well, official immunities. And that's why that settlement agreement has a great big hole in it. Now, as a ---- I don't think that ---- maybe I missed that point in your brief. Did you raise that argument? I believe we did. Did you raise it with Walker? Yes, I think we did. Now, Mr. Shulman says that the settlement agreement didn't cause the Commissioners to change any votes, and that's just not accurate. In fact, they had to ---- they disqualify or they abstained from voting on a number of occasions just because they couldn't vote their conscience, as they were required to do under their duties as officials of the State, and they couldn't vote in accordance with the settlement, so they had to just not vote. Now, in addition to those First Amendment rights, I think we need to speak briefly about the rights that they do have against Mr. Riemann's firm. That firm simultaneously represented the PUC and all five Commissioners during this bankruptcy case. In April 2001, in the case Mr. Riemann was referring to ---- Second counsel. If I understand your argument correctly, it has to be that if a court found that there was an ethical violation through improper joint representation by Mr. Riemann's firm, that that somehow invalidates the Commission's authority to enter into a binding settlement agreement. What authority do you have? What case can you cite that says that's the law? The question at that juncture, Your Honor, is who was Mr. Riemann's firm's clients? What does that have to do with the validity of the agreement? Because if, in fact, the PUC was not before the bankruptcy court, only the Commissioners were, and those were Mr. Riemann's clients. And especially because his firm represented all five Commissioners in the adversary proceeding reported at 263 Bankruptcy Report of Section 306, he had a conflict of interest that arose when the gag order was issued in May of 2003 in the settlement. He had conflicting obligations. What's your best case to support your argument that an ethical breach based upon improper joint representation invalidates the settlement that the Commission voted to approve? That's not our argument, Your Honor. Our argument is that I don't understand where you're – I still don't understand the answer to the question I asked you when you got to the podium on rebuttal. You've just lost me. I'm sorry, Your Honor. I'll try again. I don't understand the relevancy of this ethical violation to the power of the Commission to authorize the settlement. The question there on the ethical violation is who were Mr. Riemann's firm's clients? Mr. Riemann's position is that only the Commission as a separate entity was his firm's client. But the Commission's position is we signed – we directed our executive director to sign the settlement agreement, and we voted by 3 to 2 to authorize him to do it. So who cares what position Mr. Riemann is taking? We care, Your Honor. We care to be able to set aside that settlement agreement and establish the fact that the five individual commissioners were his clients. And that will pave the way to establishing the claims. It wasn't an ethical violation either. You know, ethically, unethically, whatever. Somebody he was representing in court at that point. The Commission thinks he was representing them. You're saying he wasn't representing them. That's correct, Your Honor. But what does that have to do with this case? It has to do with the denials of counsel that Ms. Lynch and Mr. Wood suffered. They repeatedly asked for separate, unconflicted counsel, and they were repeatedly refused that by the Commission president. There was – it wasn't just a matter of representation in court. It was a matter of representation during settlement negotiations. In May of 2003, the bankruptcy settlement judge issued a gag order that created an immediate conflict of interest among the parties that Mr. Riemann's firm represented. The order prohibited those lawyers from communicating about the settlement negotiations with the four commissioners other than President Peavey. By going along with that gag order, the lawyers violated their duty to inform each commissioner, their clients, of significant developments in the case and to communicate settlement offers to them. That made it impossible for the other four commissioners to evaluate the proposed settlement and to cast a considered vote on it. The conflict created by that gag order automatically disqualified Mr. Riemann's firm as soon as it arose. At that point, his firm's duty was to advise the clients of the conflict, and if there was no consent to it, withdraw from the case. But that's not what they did. To this day, Mr. Riemann's firm has never sought or received a waiver of that conflict. Mr. Riemann's firm also acted – The commission has never sought to – to invalidate or to withdraw its authority to sign the settlement agreement, has it? No. So the client has never disavowed the purported act of its executive director in signing the settlement agreement on its behalf, as a majority of the commissioners directed him to do in 2004. And that's the biggest issue in this appeal, is who was Mr. Riemann's client? But I guess the question I'm asking is what difference does it make if the client has never taken any step to disavow the authority that it gave? Suppose the commission had no lawyer. Mr. Riemann was an officious intermeddler. And the commission still wants to sign this agreement. Well, the question is whether Ms. Lynch and Mr. Wood had a right to counsel, which I think that they certainly did, under Section 307 of the Public Utilities Code and certainly under this Court's Bernhard decision. And they were entitled to have their rights effectuated. And those rights could not be effectuated because there was a wall that was dropped between them and the settlement negotiations. I don't understand. I mean, I understand you're saying that they have legitimate grievances against the president or the majority of the commission that occurred during their term of office and that they feel they could collect damages for those activities. I don't quite understand why somebody hasn't brought a suit, if that's what you believe, and why this suit is so essential to your ability to present that claim. Why don't you just why have they not gone ahead and filed a suit over the last couple of years complaining about their rights that were violated? And if somebody asserts that they can't bring that suit because of something in the settlement agreement, then why wouldn't you say that's not a valid settlement agreement in that litigation? Because once that settlement confirmation becomes final, all of its protections and all of its res judicata characteristics come into effect. Those have not gone to the court. If you're right on the ethical issue, it doesn't. If there is a breach of ethics by the law firm based on improper joint representation, they've got a claim in damages, certainly for malpractice by Mr. Ryman's firm and whatever damages flow from that malpractice. That's certainly true, Your Honor. But this one. So why isn't the answer to Judge Reinhart's question? We filed the complaint yesterday, and the process servers are looking for Mr. Ryman. Maybe that ought to be the question, Your Honor. But this settlement agreement stands as an enormous obstacle to their being able to effectuate those claims and, in fact, to being able to frame those claims. How? I mean, they know what their claims are. Their claims are multiple improper representation, failure to keep me advised in the settlement process. I was injured by being my vote was uninformed because they hoodwinked me, and I now want damages. And they've known that for two years. What I don't understand is why can you why is it they have to attack the settlement agreement in this suit as opposed to that one? Because of the centrality of the Eleventh Amendment issue and the question of who was before the bankruptcy court and who was not before the bankruptcy court. I guess. But why is it that that can only be raised in this case and not in that one? I'm not saying that it can't be raised at all in another case. But it would be barred in that case if we said this case is moot. Under the settlement agreement, the Commissioners, as parts of the Commission are, are foreclosed from contesting any aspect of the validity of the settlement. And that's the impediment. Okay. I guess we're going to end up being puzzled. Right. We're going to leave here still being puzzled by some of the issues. But we've gone way over to that. I think there's also, you know, a second and really practical answer, which is that for two individuals of very limited personal resources, biting off all of that litigation is really quite a lot and quite a daunting task. And I have to affirm, that's really good luck for them. Thank you very much, Your Honor. Thank you, Mr. Davis. Thank you both, all of you very much, for the argument. The case just argued will be submitted. The Court will stand in recess for the morning.
judges: Reinhardt, Paez, Tallman